COULTER *v*. FIRST FEDERAL SAVINGS & LOAN ASSOCIATION OF EL DORADO.

4-4774

Opinion delivered December 6, 1937.

Coulter & Coulter, for appellant.

J. S. Brooks and J. S. Brooks, Jr., for appellee.

GRIFFIN SMITH, C. J.   A decree foreclosing a mortgage and giving judgment on the note it secured was rendered against appellants and in favor of appellee by the Union chancery court February 17, 1936, from which no appeal was taken.   The decree, based upon a complaint filed December 13, 1935, recites that the defendants (appellants here), executed their note, secured by a mortgage on certain real property, dated July 26, 1934, the note being for $800, payable in monthly installments of $16.24, inclusive of principal and interest at the rate of eight per cent. per annum.   The obligation provided that in the event of default in any payment for more than thirty days, the entire indebtedness, at the election of the payee, should become due, with interest at ten per cent.

The chancellor found that a credit of $19.10 was due on the indebtedness as of September 22, 1934, leaving a principal balance of $780.90; that no additional payments had been made, and that appellee was entitled to judgment for $780 with interest at 10 per cent. from September 22, 1934, with costs.

It was further found that Mrs. Mattie E. Perdue held a mortgage on the property described in appellee's mortgage, but that it was inferior to appellee's security.

The decree shows marginal indorsement as follows: "Received of Boone T. Coulter, the sum of $292.32 on February 26, 1936, and $50 on August 28, 1936, to apply on this decree." Such indorsement is signed for appellee by J. S. Brooks, assistant secretary, and is attested by the clerk.

Appellant Boone T. Coulter testified that, after final decree had been rendered by default, he took the matter up with appellee's agent, John Brinn, endeavor-

ing to effectuate a settlement, and that Brinn told him if he would pay the delinquent installments, court costs, and attorney's fee, the decree would be set aside. "I issued a check in the sum of $328.17, which brought the matter up to date, including court costs and attorney's fee. I then prepared a stipulation for dismissal and sent it to Judge Brooks [assistant secretary, and attorney, for appellee]. The stipulation was not signed. I discussed the matter once or twice with Judge Brooks and he raised the contention that it might mean the satisfaction of the judgment if the decree were set aside, and it rocked along until the end of the term, and Brinn came to see me again, and I made a payment of $50. The $50 didn't bring the payment to date. I again became delinquent and the property sold under the decree, and the record shows the decree was for $790. I contend the sale was irregular; there was something wrong about it. There was some collateral up, but I don't know where it is."

On cross-examination Mr. Coulter testified that the collateral was in the form of notes "to different ones."

"Q. We told you we would let the decree stand of record so long as you kept the payments up? A. No you didn't. I told Brinn to get me up a statement of what was due and I would make some adjustment or give him a deed. . . . I am about nine months behind. There was a second mortgage to Mrs. Mattie E. Perdue for $70."

John Brinn, secretary-treasurer, testified that he remembered when the decree of foreclosure was taken; that he did not agree with Mr. Coulter to dismiss the case and set the decree aside.

"Q. Just what agreement, if any, did you have with Mr. Coulter? A. There wasn't any agreement. Mr. Coulter asked me to get him up a statement of what was due to date, which I did, and which I think amounted to $328.17, which he paid February 26, 1936. There was nothing said about the decree being set aside. After that time (August 28, 1936) he paid $50. I talked with him off and on and he said he was going to try and pay

it up; that he would either pay up or give us a deed before it was advertised."

Brinn further testified that the collateral notes referred to were in his office; that they were being held for Mrs. Perdue, having been put up to secure the second mortgage.

J. S. Brooks testified that after the decree was rendered Mr. Coulter went to Brinn and wanted to pay the loan up to date. "Brinn came to me and talked to me about it, and I told him to advise Mr. Coulter that so long as he kept his payments up to date there would be no sale under the decree. Some few days after the decree was taken Mr. Coulter sent over to my office an agreement for me to sign, and I refused to sign it. He paid some over $328, and later paid $50, which is credited on the decree. Along in the early part of this year [1937] the matter was so delinquent that I, on January 28, wrote him as follows: 'For the past two weeks I have been trying to get Mr. Brinn to contact you with reference to the delinquent payments to the first Federal Savings & Loan Association, but have been unable to do so. It is apparent that we must proceed to sell this property under our decree, unless you are willing to give us a deed to it, together with the possession of the property. Please telephone me, or let me hear from you by return mail immediately on receipt of this letter, otherwise we will have to proceed without further notice.'

"On February 9 I wrote him as follows: 'I again desire to call your attention to your delinquent loan with the First Federal Savings & Loan Association of El Dorado. You will recall that I asked you about this Saturday morning on the 'phone, and that you stated you would give this matter your attention the first of the week. Please let me know about this matter by noon tomorrow, Wednesday; that is, pay the loan up or give me a deed. Otherwise, the notice of sale of this property will go into the Huttig News on Thursday of this week.' We did advertise the sale and sold it, and Mrs. Perdue bid it in on her second mortgage. Mr. Coulter

said we sold it for too much. The record shows that we bid all that was due, and there is no deficiency judgment.''

On cross-examination Mr. Brooks was asked if he bid all that was due, and replied, ''All that was alleged in the complaint.''

''Q. Then you didn't have $700 coming and you bid $700, so you bid more than you had the right to bid, and there is some $400 more than was due, and something will have to be done about it. If you bid it in for $700, then there was $400 that should have gone to the property owner—that would be true, wouldn't it? A. No.''

The property was duly advertised, and the sale was had on March 5, 1937. In his report, the commissioner said: ''At such sale so made and had, First Federal Savings & Loan Association of El Dorado bid and offered the sum of $700, and that being the highest bid, the same was struck off and sold to it for that sum, $700.''

Assignments of error are: ''(1) That the trial court erred in refusing to make a finding of fact to the effect that there was an agreement between appellants and appellee to set aside the decree. (2) That the trial court erred in overruling the objections and exceptions of appellants to the confirmation of the sale, and in confirming such sale, over the objections and exceptions of appellants, for the following reasons: (a) Ruth Williams was named by the court in the decree as special commissioner to make the sale, whereas the sale was made by L. B. Smith, without any order of substitution. (b) No sale was held at the term at which the decree was rendered, or at the subsequent term, and neither did the decree fix the time, place and terms of sale, nor was there any additional or supplemental order of the court fixing the same. (c) The plaintiff-purchaser bid an amount in excess of its debt, did not pay the price bid, did not execute any note, bond or security therefor, and did not credit any part of the bid on the judgment or decree, or pay or secure in any manner the excess of its bid over its debt. (d) That the property was pur-

chased by appellant and the order directs a deed to be executed to Mrs. Mattie E. Perdue, with no reason or authority therefor.''

(1) The findings of the chancellor that there was no conclusive agreement to set the decree aside upon payment of amounts due at the time it was rendered are not against the weight of evidence. While Brooks and Brinn for appellee and Coulter for appellants had different views with respect to circumstances attending the payments, the testimony discloses that such differences are based upon conclusions or inferences to be drawn from acts and conversations. These results frequently attend matters which depend upon parol, and when, as in the instant case, a chancellor makes a finding from conflicting evidence, it is not necessarily intended as an expression of belief in the statements of one witness, or a disbelief in the testimony of another. Rather, it is the court's interpretation of each fact or declaration in its relation to every other fact or declaration, from which a controlling conclusion is drawn as to what effect the parties intended should be given to their words and conduct.

(2) The written objections to confirmation filed by appellants raised a question of fact only; that is, Was there an agreement that the decree should be set aside? Testimony as to other matters was introduced without objections by appellee, and to that extent the exceptions will be treated as having been amplified, or amended. Exceptions ''a,'' ''b,'' ''c'' and ''d'' were brought into the record without having been set out in the exceptions as filed.

(a) In the decree Ruth Williams, ''clerk of this court,'' was appointed special commissioner to conduct the sale. She was succeeded in office by L. B. Smith. In *Bank of DeQueen* v. *Troyer,* 172 Ark. 379, 288 S. W. 889, this court held: ''The order of the court [chancery, C. E. JOHNSON presiding] to W. H. Wardlow, to make a deed as commissioner, was binding upon his successor in office; so D. C. Sypert, his successor, had the right to make the deed without an additional order of

the court directing him to do so. Authority was conferred upon him to make the deed by § 2196, Crawford & Moses' Digest, which is as follows: 'The clerks of the circuit courts in the several counties shall be clerks of the chancery courts and ex-officio masters and commissioners thereof in each of the said counties.' "

The duties under a decree devolving upon such official directed to execute a deed would not, by analogy, be different from the duties of such official who had been directed to consummate a sale. It seems conclusive that Ruth Williams was appointed because of her position as clerk, and when L. B. Smith in succession performed the same act, the original purpose of the decree was served.

(b) It was not essential to the court's jurisdiction that the sale be had at the same, or during a subsequent, term, the direction being that if payment were not made within ten days the commissioner should sell the property and report back to the court. The effect of this order was to retain jurisdiction until the commissioner's report was presented. Although the decree did not fix the time of the sale, or the place where it should be held, the exceptions filed by appellants did not raise these questions, nor was any proof offered to show irregularities.

The notice of sale recited that the property would be offered for sale "At the east door or entrance of the county courthouse in which said court is held, in the county of Union, within the hours prescribed by law for a judicial sale." The presumption of regularity attaching to the court's action in confirming the sale protects the purchaser against these objections. The notice also specified that the sale would be on a credit of three months, which is in conformity with § 9477 of Pope's Digest.

(c) Did the purchaser bid an amount in excess of the debt without paying the price bid, and without executing note, bond, or security therefor? On this point the record is in a very unsatisfactory condition, no proof having been offered by either side to clarify the contention now made by appellants—a contention they failed

to make at the time exceptions were filed. Interest on the principal debt of $780 (90c seems to have been lost sight of in formulating the decree) from September 22, 1934, to February 22, 1936, a period of 17 months and four days, would amount to $111.36, and this, added to the debt, would bring the total to $891.36. At that time $292.32 was paid, leaving $599.04. Interest on this balance until August 28, 1936, six months and six days, would be $30.32, or a total of $629.36. Payment of $50 on August 28 reduced the obligation to $579.36. This balance drew interest until the date of sale, March 5, 1937, six months and seven days, amounting to $30.04, or a total indebtedness of $609.40 as of March 5, 1937.

(d) It is contended by appellee, and not disputed by appellants, that appellee assigned the certificate of purchase to Mrs. Perdue, whose original debt was $70. It was appellants' duty to bring up the entire record, but the transcript does not show such assignment.

Costs and taxes might have increased the indebtedness to the amount of the bid, $700, and since the exceptions did not raise these questions, and the testimony is not sufficiently clear to justify a finding here that the chancellor was in error, the decree will be affirmed. It is so ordered.